IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARTIN DULBERG, individually and on behalf of all others similarly situated,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., and RASIER, LLC,

Defendants.

No. C 17-00850 WHA

**ORDER DENYING MOTION TO DISMISS**

## INTRODUCTION

In this putative class action for breach of contract, defendants move to dismiss the amended complaint. The motion is **DENIED**.

## STATEMENT

Plaintiff Martin Dulberg initially brought this putative class action against defendants Uber Technologies, Inc., and its subsidiary Rasier LLC ("collectively, "Uber"), for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel (in the alternative), and unjust enrichment (in the alternative). After Uber moved to dismiss the complaint, Dulberg filed an amended complaint, thereby mooting that motion (Dkt. No. 34). The amended complaint states only one claim for relief for breach of contract and is now challenged on another motion to dismiss. The following is taken from its well-pled allegations (Dkt. No. 30).

The essence of the amended complaint is that Uber found a way to charge higher rates to its passengers but refuses to use those higher rates in calculating compensation for its drivers pursuant to their percentage-based fee agreement with Uber. Dulberg is an Uber driver who contends that his standardized agreement with Uber entitles him to higher compensation as a result of Uber's higher rates for passengers. On the other hand, Uber contends it can raise its rates for passengers by instituting a more aggressive pricing regime while forcing drivers to accept the same compensation they would have received under the old pricing regime, keeping the difference for itself. Now follow the details.

Uber provides a mobile phone application that connects passengers seeking transportation services with Uber drivers (*id.* ¶ 1). Dulberg, who resides in Raleigh, North Carolina, is one of many such Uber drivers (*see id.* ¶ 5). The compensation scheme between Dulberg and Uber is governed by a "Technology Services Agreement" dated December 11, 2015 (the "driver agreement"), which forms the basis for this lawsuit (*see id.* ¶ 2).

Section 4.1 of the driver agreement states (Dkt. No. 30-1):

> **Fare Calculation and Your Payment.** You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services (*"Fare"*), where such Fare is calculated based upon a base fare amount plus distance (as determined by Company using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory (*"Fare Calculation"*). You acknowledge and agree that the Fare provided under the Fare Calculation is the only payment you will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, if applicable. You: (i) appoint Company as your limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by you, applicable taxes and fees from the User on your behalf via the payment processing functionality facilitated by the Uber Services; and (ii) agree that payment made by User to Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the same as payment made directly by User to you. In addition, the parties acknowledge and agree that as between you and Company, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii)

> herein, a *"Negotiated Fare"*). Company shall consider all such requests from you in good faith. Company agrees to remit, or cause to be remitted, to you on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees.

Section 4.4 of the driver agreement states (*ibid.*):

> **Service Fee.** In consideration of Company's provision of the Driver App and the Uber Services for your use and benefit hereunder, you agree to pay Company a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to you via email or otherwise made available electronically by Company from time to time for the applicable Territory (*"Service Fee"*). In the event regulations applicable to your Territory require taxes to be calculated on the Fare, Company shall calculate the Service Fee based on the Fare net of such taxes. Company reserves the right to change the Service Fee at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of such change. Continued use of Uber Services after any such change in the Service Fee calculation shall constitute your consent to such change.

The driver agreement's "Service Fee Addendum" for Raleigh adds (Dkt. No. 30-2):

> 2. **Service Fee.** In exchange for your access to and use of the Uber app, including the right to receive requests for transportation, you agree to pay to the Company a fee for each accepted trip request as set forth below.
>
> Raleigh partners first activated **before** November 23, 2015:
>
> |  | uberX | uberXL | UberSELECT |
> | --- | --- | --- | --- |
> | SERVICE FEE | 20% | 28% | 28% |
>
> Raleigh partners first activated **on or after** November 23, 2015:
>
> |  | uberX | uberXL | UberSELECT |
> | --- | --- | --- | --- |
> | SERVICE FEE | 25% | 28% | 28% |
>
> 3. **Booking Fee.** You will be charged a Booking Fee for every trip (amount posted and updated on City Page), and Company will collect this fee from riders on your behalf.

Dulberg signed up as a driver for UberX in May 2014 and as a driver for UberSelect in February 2015 (Dkt. No. 30 ¶ 13). Accordingly, under the driver agreement, he could charge to passengers (1) the Fare, (2) Uber's Booking Fee, and (3) any applicable tolls, taxes, or fees for each ride. Uber collected these amounts from passengers on Dulberg's behalf. Additionally,

3

Dulberg owed to Uber (1) a Service Fee equal to 20 percent of each UberX ride and 28 percent of each UberSelect ride, and (2) Uber's Booking Fee. Uber withheld these before remitting anything to Dulberg.

According to the amended complaint, sometime in the autumn of 2016, Uber's policy changed from calculating the price for each ride *after* the ride to calculating the price upfront *before* the ride. This new "upfront pricing" policy appeared on Uber's website. According to the amended complaint, Uber's website *prior* to the shift allegedly stated (in a section directed to *drivers*) (*id.* ¶¶ 19, 27):

> When a rider takes a trip with you, they are charged a fare at the end of the ride. Each fare is calculated based on how far and how long the trip took to complete. Fares are calculated by adding a base fare (if applicable) + time and distance rates. Riders are also charged a booking fee (approx $1-2) . . . . Let's say, for example, that you're in Los Angeles and your rider wants to go from Downtown LA to West Hollywood, which is approximately 9 miles and 35 minutes away. The fare that the rider pays is calculated like this: **(9 miles x $0.90) + (35 minutes x $0.15) + $1.65 booking fee = $15.00**[.] Drivers using the partner app are charged an Uber Fee as a percentage of each trip fare.

In contrast, Uber's website *currently* states (in a section directed to *passengers*) (*see id.* ¶ 18):

> UPFRONT FARES
> With upfront pricing, you know the exact cost of your trip before requesting. This fare includes (but is not limited to):
> - A base rate
> - Rates for estimated time and distance of the route
> - The current demand for rides in the area
>
> A booking fee and any applicable surcharges, fees, and tolls are also calculated and included.
>
> When you request a ride, you agree to be charged the upfront fare when the trip ends. Your fare may increase if you travel to a different destination or make extra stops along the route, or the trip takes much longer than expected.
>
> If an upfront fare is not honored, you will either be charged the minimum fare or a fare based on the measured time and distance for your trip, including any base fare, booking fee, surcharges, tolls, and other relevant factors such as a dynamic pricing charge.
>
> You'll always get a receipt for any trip fare. If your fare is different than the upfront fare you agreed to, your receipt will explain why.

*See How are fares calculated?*, UBER HELP, https://help.uber.com/ (follow "A Guide to Uber" hyperlink, then "How are fares calculated?" hyperlink under "After my ride") (last visited July 28, 2017); *see also Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015) (courts may consider documents not physically attached to the plaintiff's pleading if they are incorporated by reference, *i.e.*, their contents are alleged in the complaint and no party questions their authenticity).

The amended complaint presents inconsistent allegations — discussed below in the context of the parties' arguments — about how exactly Uber breached the driver agreement, but its basic theory seems to be that the driver agreement set forth a fixed compensation scheme, as between Uber and its drivers, that comprehensively regulates distribution of all payments collected from Uber's passengers. Uber then found a way to charge higher rates to its passengers by switching to an "upfront pricing" policy that uses aggressively *estimated* time and distance amounts to calculate the cost for each ride. But, unfortunately for drivers, Uber did not use the same aggressively *estimated* time and distance amounts to calculate Fares under the driver agreement. Instead, Uber continued to use *actual* time and distance amounts (*i.e.*, the cheaper system) for purposes of compensating its drivers, keeping the difference for itself. This, according to the amended complaint, breaches the driver agreement by effectively altering the percentage-based breakdown of Fares between drivers' remittances and Uber's Service Fees (*see* Dkt. No. 30 ¶¶ 27–28).

Uber now moves to dismiss the amended complaint for failure to state a claim (Dkt. No. 38). This order follows full briefing and oral argument.

**ANALYSIS**

1. **LEGAL STANDARD.**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When ruling on a motion to dismiss, [courts] may generally

consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008) (quotation and citations omitted). Courts accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party. *Ibid.* Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681.

### 2. THE PARTIES' ARGUMENTS.

As a preliminary matter, the parties' briefs struggle to clearly and precisely articulate what Dulberg's theory of the case is supposed to be, thereby generating a considerable amount of unresponsive arguments. This difficulty traces back to the amended complaint itself, which misleadingly asserts in multiple places that the Fare defined in the driver agreement is the *total* amount of *everything* that Uber charges to its passengers. As just one example, the amended complaint alleges (Dkt. No. 30 ¶ 29):

> [O]n February 2, 2017, Plaintiff drove an UberX passenger . . . in Raleigh, North Carolina. The passenger was charged $15.38. This is the Fare, which Uber collected on Plaintiff's behalf as Plaintiff's agent. The Booking Fee in Raleigh at the time was $1.80. So, Dulberg should have made 80% of ($15.38 - $1.80) = $10.86. But Dulberg was paid $9.91 (80% of Uber's backend hypothetical calculation of $12.39, which had nothing to [*sic*] with the Fare that was actually charged for the ride — the amount that the passenger paid to Plaintiff and that Uber collected on Plaintiff's behalf). This is 95 cents less than Dulberg should have made under the Agreement. Indeed, instead of receiving the promised 80% of the Fare, Dulberg received approximately 73%. Instead of receiving 20% of the Fare, Uber received approximately 27%.

On its face, this narrative is self-contradicting. It claims the Fare was the *total* amount of $15.38 charged to the passenger, but also claims Dulberg should have received only 80 percent of $13.58 ($15.38 – $1.80), inconsistently indicating that the Fare was actually *less* than the total amount charged to the passenger. As another example, the amended complaint alleges that "[t]he money that passengers pay for a ride, minus Uber's service fee, belongs to Plaintiff and other drivers" (*id.* ¶ 47). Based on these and other similar allegations, the amended complaint seems to assert — contrary to the driver agreement — that the Fare includes *everything* charged to a passenger, including Uber's Booking Fee and any applicable tolls, taxes, or fees.

6

Seizing on this problem, Uber dedicates its motion to arguing — correctly — that the Fare defined in the driver agreement is *not* the total amount charged to passengers for rides (*see* Dkt. No. 38 at 7–12). In response, Dulberg's opposition brief expressly withdraws the amended complaint's allegation that "the entire amount of the upfront charge [is] the Fare" and admits that Uber's upfront pricing (*i.e.*, the total amount collected from passengers) "includes more than just the Fare" (Dkt. No. 40 at 11–12 n.2).

The best argument discernible from Dulberg's opposition brief is that the driver agreement comprehensively regulates distribution of all payments collected from Uber's passengers (*see, e.g.*, Dkt. No. 40 at 19). Since the driver agreement contemplated only one "Fare" consisting of a base amount plus applicable time and distance amounts, it must follow that the "Fare" defined in the driver agreement corresponds exactly to the base amount plus applicable time and distance amounts included in Uber's "upfront pricing" policy. Thus, however Uber calculates the latter, it should likewise calculate the former.

This reading finds support in both the driver agreement and Uber's "upfront pricing" policy, both of which cover essentially identical charges to passengers, *i.e.*, (1) a rate calculated using a base amount plus applicable time and distance amounts for the area; (2) any tolls, taxes, or fees; and (3) a booking fee. Significantly, and as Dulberg points out in his opposition brief (Dkt. No. 40 at 10), the driver agreement itself did not specify whether the Fare Calculation uses *actual* or *estimated* time and distance amounts. Uber contends in its motion that the Fare is calculated based on *actual* amounts determined after each "completed trip" but points to no such provision in the driver agreement (*see* Dkt. No. 38 at 10–11).

On the contrary, the driver agreement simply stated the "Fare is calculated based upon a base fare amount plus distance . . . and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory (*"Fare Calculation"*)" (Dkt. No. 30-1; *see also* Dkt. No. 38 at 9). Nothing in the driver agreement purported to dictate how that website determines time or distance amounts, or precluded the possibility that the website's — and, by extension, the driver agreement's — method of determining such amounts might change over time.

7

Currently, the website prompts passengers to "find a city" from among a list of cities serviced by Uber. Upon selecting a city, the passenger is then prompted to "get a fare estimate" by inputting a pickup location and destination. Thus, the website referenced in the driver agreement currently appears to facilitate a fare calculation process that closely tracks Uber's current "upfront pricing" policy. This further supports the plausible inference that Uber's "upfront pricing" policy simply explains to passengers the enumerated charges covered by the driver agreement and Uber must use the same time and distance amounts — whether estimated or actual — for both.

Despite the foregoing, according to the amended complaint, Uber separately calculates a post-ride "Fare" based on the *actual* time and distance amounts for each ride, and remits to drivers their percentage of that "Fare." Since Uber's aggressive upfront estimates consistently exceed the actual time and distance amounts, this results in drivers receiving less than what they would be entitled to under the driver agreement. The difference remains with Uber, effectively allowing Uber to retain a higher Service Fee than it is actually entitled to under the driver agreement. Dulberg describes this process as essentially calculating the "Fare" twice — once upfront, using higher *estimated* time and distance amounts, to determine Uber's own Service Fee, and again after each ride, using lower *actual* time and distance amounts, to determine the amount remitted to drivers — even though the driver agreement tied both Uber's Service Fee and the driver's remittance to the same calculated Fare for each ride. These allegations, taken as true, suffice to state a claim for breach of contract.

In its reply brief, Uber points out that Dulberg admits (1) the driver agreement has not changed since December 2015 despite Uber's shift to upfront pricing in the interim, and (2) Uber's conduct prior to the shift — *i.e.*, calculating Dulberg's remittance based on the *actual* time and distance amounts determined after each ride — did not violate the driver agreement. Thus, Uber reasons, Dulberg has admitted away his case because the same conduct that comported with the driver agreement before the shift cannot now violate the same driver agreement after the shift (Dkt. No. 45 at 9–11). This is counterfeit logic. As stated, the driver agreement left it up to Uber to determine the applicable time and distance amounts by reference

to Uber's website. Nothing in the driver agreement precluded Uber from using actual *or* estimated amounts, or from unilaterally changing its method of calculation by changing the referenced website. The bottom line is that, whatever method Uber chooses, it must apply that same method to determine time and distance amounts for both charging its passengers and remitting payments to its drivers — or so the amended complaint plausibly alleges.

Uber attempts to distinguish the driver agreement from the "upfront pricing" policy on the basis that the "Fare" defined in the former contemplates *only* a base amount plus time and distance amounts, whereas the "fare" described in the latter is expressly "not limited to" those amounts (*see* Dkt. No. 45 at 7). But this may turn out to be a specious distinction, easily explained by the fact that the "upfront pricing" policy, unlike the driver agreement, defines the word "fare" as "the exact cost of [a] trip" — including "[a] booking fee and any applicable surcharges, fees, and tolls," as well as any adjustments for "a different destination," "extra stops along the route," or a trip that "takes much longer than expected." The "not limited to" language in the "upfront pricing" policy therefore does not detract from the plausible inference that Uber remains contractually obligated to use the *same* time and distance amounts — whether estimated or actual — to calculate *both* charges to passengers under the "upfront pricing" policy *and* payments remitted to drivers under the driver agreement.

Uber also suggested, both in briefing and at oral argument, that it can retain more than just the Booking Fee and Service Fee provided by the driver agreement because nothing therein purported to limit Uber's ability to charge its passengers. In response to questions posed by the Court in advance of the hearing (Dkt. No. 49), counsel for Uber offered up UberPOOL (which allows passengers to share rides and split trip costs with each other), surge pricing, and other promotions and discounts that Uber offers its passengers as examples of "charges" not covered by the driver agreement. None of these examples render implausible the amended complaint's theory that the driver agreement obligated Uber to honor the fixed, percentage-based split of the calculated Fare for each ride between its Service Fee and the driver's remittance.

*First*, according to counsel, UberPOOL and other promotions and discounts that Uber offers to attract passengers do not result in any lower compensation for drivers. Rather, Uber

9

itself bears the cost of offering those promotions and discounts. But Uber can use various promotions and discounts to offset the cost of a calculated Fare to the passenger without ever actually altering either the calculation of that Fare or the corresponding remittance to the driver pursuant to the driver agreement. *Second*, according to counsel, surcharge pricing is simply a multiplier that increases the overall Fare calculated pursuant to the driver agreement. That multiplier applies equally to both a driver's remittance and Uber's Service Fee from the increased Fare and in no way affects the contractually-determined breakdown of the Fare as between Uber and its driver.

In short, the amended complaint plausibly alleges that, after shifting to "upfront pricing," Uber had to calculate Fares for drivers under the driver agreement using the same aggressively *estimated* time and distance amounts that it uses for charging passengers. Uber, however, continues to use *actual* time and distance amounts to calculate Fares and shortchange its drivers under the driver agreement, while retaining more money for itself. At this stage, these allegations are sufficient to survive dismissal.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 31, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE