RANDALL W. EDWARDS (S.B. #179053)
redwards@omm.com
MATTHEW D. POWERS (S.B. #212682)
mpowers@omm.com
DAMALI A. TAYLOR (S.B. #262489)
dtaylor@omm.com
ADAM M. KAPLAN (S.B. #298077)
akaplan@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California  94111-3823
Telephone:   (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and RASIER, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN DULBERG, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., and RASIER, LLC,<br><br>Defendants. | Case No. 3:17-CV-00850-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC. AND RASIER, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: February 8, 2018<br>Time:              8:00 a.m.<br>Judge:            Hon. William H. Alsup<br>Courtroom:     8 |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................ 1

II. FACTUAL BACKGROUND .............................................................. 3

    A.  Uber Provides Lead Generation Technology Services ............................ 4

    B.  The Relevant Terms of the TSA ......................................................... 4

    C.  Uber's Implementation of Its Upfront Pricing Model for Riders ............... 5

    D.  Drivers' Knowledge and Understanding About Upfront Pricing Varied ......... 8

    E.  Plaintiff Improperly Extended Trips and Accepted Overpayments from Uber ......................................................................................... 9

    F.  The Scope of Plaintiff's Class Definition ............................................ 10

III. RIGOROUS ANALYSIS IS NEEDED TO CERTIFY A CLASS UNDER RULE 23 ....................................................................................... 10

    A.  Plaintiff Must Provide Evidence to Support Each Element of Certification ......... 11

    B.  Rule 23(b)(3) Predominance Requires Common Answers ...................... 12

    C.  Rule 23(a)(4) Adequacy of Representation Requires No Intra-Class Conflicts and No Class-Representative Specific Defenses ...................... 12

IV. INDIVIDUALIZED ISSUES DEFEAT PREDOMINANCE AND ADEQUACY .......... 13

    A.  The Essential Element of Fact of Damage Requires Individualized Evidence and Creates a Serious Conflict of Interest ............................ 13

        1.  The Element of Fact of Damage Requires Individualized Evidence ......... 13

        2.  Plaintiff Ignores Serious Intra-Class Conflicts .......................... 17

    B.  Uber Has Plaintiff-Specific and Individualized Defenses That Further Preclude Certification on Predominance and Adequacy Grounds ................ 19

V.  CONCLUSION ................................................................................ 21

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

# TABLE OF AUTHORITIES

Page

## CASES

Aghdasi v. Mercury Ins. Grp., Inc.,
2016 WL 5899301 (C.D. Cal. Jan. 12, 2016) ........................................................................... 19

Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.,
247 F.R.D. 156 (C.D. Cal. 2007) ...................................................................................... 18, 19

Amchem Prods., Inc. v. Windsor,
521 U.S. 591 (1997) ............................................................................................................ passim

Backus v. ConAgra Foods, Inc.,
2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) ................................................................... 12, 20

Califano v. Yamasaki,
442 U.S. 682 (1979) ................................................................................................................. 10

Chastain v. Union Sec. Life Ins. Co.,
2008 WL 11333691 (C.D. Cal. May 6, 2008) .......................................................................... 16

Comcast Corp. v. Behrend,
569 U.S. 27 (2013) ................................................................................................................... 12

Curtis v. Extra Space Storage, Inc.,
2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ......................................................................... 19

Deitz v. Comcast Corp.,
2007 WL 2015440 (N.D. Cal. July 11, 2007) .......................................................................... 12

Ellis v. Costco Wholesale Corp.,
657 F.3d 970 (9th Cir. 2011) ............................................................................................. 11, 12

Ellsworth v. U.S. Bank, N.A.,
2014 WL 2734953,  (N.D. Cal. June 13, 2014) ....................................................................... 17

Ewert v. eBay, Inc.,
2010 WL 4269259 (N.D. Cal. Oct. 25, 2010) .......................................................................... 17

Fields v. Mobile Messengers Am., Inc.,
2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ......................................................................... 11

Gonzales v. Comcast Corp.,
2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ................................................................................. 14

Gutierrez v. Wells Fargo & Co.,
2010 WL 1233810 (N.D. Cal. Mar. 26, 2010) ......................................................................... 14

Hanlon v. Chrysler Corp.,
150 F.3d 1011 (9th Cir. 1998) ................................................................................................. 12

Herskowitz v. Apple Inc.,
301 F.R.D. 460 (N.D. Cal. 2014) ............................................................................................. 12

Hofstetter v. Chase Home Fin.,
2011 WL 1225900 (N.D. Cal. Mar. 21, 2011) ......................................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Med. Capital Sec. Litig.*,
   2011 WL 5067208 (C.D. Cal. July 26, 2011) .......................................................................... 17

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ............................................................................................. 12

*Kamar v. Radio Shack*,
   375 F. App'x 734 (9th Cir. 2010) ............................................................................................ 18

*Lassen Mun. Util. Dist. v. Kinross Gold U.S.A. Inc.*,
   2013 WL 924623 (E.D. Cal. Mar. 8, 2013) ............................................................................ 20

*Levy v. World Wrestling Entm't, Inc.*,
   2009 WL 455258 (D. Conn. Feb. 23, 2009) ............................................................................ 21

*Lucas v. Breg, Inc.*,
   212 F. Supp. 3d 950 (S.D. Cal. 2016) ..................................................................................... 13

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ................................................................................................... 11

*Monaco v. Bear Stearns Cos.*,
   2012 WL 10006987 (C.D. Cal. Dec. 10, 2012) ....................................................................... 19

*Moore v. Southtrust Corp.*,
   2005 WL 4663636 (E.D. Va. June 10, 2005) .......................................................................... 21

*Oasis W. Realty, LLC v. Goldman*,
   250 P.3d 1115 (Cal. 2011) ....................................................................................................... 13

*Parino v. BidRack, Inc.*,
   838 F. Supp. 2d 900 (N.D. Cal. 2011) ..................................................................................... 13

*Randleman v. Fid. Nat'l Title Ins. Co.*,
   646 F.3d 347 (6th Cir. 2011) ................................................................................................... 18

*Robinson v. Onstar, LLC*,
   2016 WL 4493733 (S.D. Cal. Aug. 25, 2016) ......................................................................... 20

*Rodman v. Safeway, Inc.*,
   2014 WL 988992 (N.D. Cal. Mar. 20, 2014) ........................................................................... 16

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................................................... 12

*Roling v. E*Trade Sec. LLC*,
   860 F. Supp. 2d 1035 (N.D. Cal. 2012) ................................................................................... 20

*Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ................................................................................................. 18

*Ubaldi v. SLM Corp.*,
   2014 WL 1266783 (N.D. Cal. Mar. 24, 2014) ......................................................................... 18

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3
*Vedachalam v. Tata Consulting Servs.*,
2012 WL 1110004 (N.D. Cal. Apr. 2, 2014) ........................................................... 17

4

*Velasquez v. HSBC Fin. Corp.*,
5
2009 WL 112919 (N.D. Cal. Jan. 16, 2009) ........................................................... 18

6
*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................................................................... 11, 12

7

**STATUTES**

8
28 U.S.C. § 2072 ................................................................................................... 10, 19

9
Cal. Civ. Code § 1589 ................................................................................................. 20

10
Cal. Evid. Code § 623 ................................................................................................. 19

**RULES**

11
12
Fed. R. Civ. P. 23(a)(4) ......................................................................................... 11, 12

13
Fed. R. Civ. P. 23(b)(3) ............................................................................................... 11

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

1    **I.       INTRODUCTION**

2            In his effort to paint the picture of a case "tailor made" for class treatment, Plaintiff

3    ignores a fatal flaw in seeking collective adjudication: thousands of drivers—a clear majority of

4    his proposed class—would be *worse* off under the contract interpretation Plaintiff seeks to

5    impose.  Plaintiff contends that Uber breached the December 11, 2015 Technology Services

6    Agreement ("TSA") with drivers when it began using an "upfront pricing" model for riders.

7    Under upfront pricing, the rider's charge for a trip is determined based on estimates before the

8    trip begins using assumptions and data regarding traffic and other conditions.  But while rider

9    payments were based on estimates and predictions, drivers were still paid according to the actual

10   time and distance of each trip.  Uber took on the risk that its estimated upfront price may turn out

11   to be low—and in such circumstances, it was typically Uber (not the rider or the driver) that lost

12   revenue as a result.  Uber has produced comprehensive trip data for the drivers in the putative

13   class— ██████████████████████████████████████████████████████████

14   ███████████████████████████████ .

15           As both Plaintiff and this Court have recognized, Plaintiff cannot "get it both ways"; the

16   "Uber driver would have to take less" if it turned out in a given case that the driver would be

17   worse off under Plaintiff's interpretation of TSA.  Edwards Decl., Ex. D (Hr'g Tr. at 3-4).  But

18   Plaintiff's motion ignores the consequence of this basic premise.  ██████████████████ ,

19   Plaintiff instead asserts that common issues predominate based on his core (unsupported)

20   allegation that all drivers were systematically underpaid as a result of upfront pricing.  Mot. at 4.

21   That key allegation is demonstrably untrue:  Most drivers in the putative class actually were paid

22   more than they would have been paid under Plaintiff's preferred interpretation of the TSA.  And

23   whether a particular driver would have benefited from Plaintiff's theory is an individualized issue

24   dependent on his or her unique driving history, as are Uber's potential affirmative defenses

25   related to ratification and estoppel.  Thus, Plaintiff's motion to certify rests entirely on a flawed

26   assertion that the "only substantive issue" in the case will be the interpretation of the TSA.  To be

27   sure, interpreting the TSA is an important issue.  But certification under Rule 23(b)(3) is not

28   warranted where, as here, the different circumstances of each driver create other critical

1    individualized issues and give rise to significant intra-class conflicts.

2           Plaintiff offers no evidence that he could establish on a classwide basis the basic fact of

3    damage—an essential element of his breach of contract claim under California law.  Rather, he

4    simply assumes, without discussion, that all class members "suffered the same alleged breach of

5    contract injury."  But the "rigorous analysis" courts require to certify a class under Rule 23

6    requires more than an unsupported assumption.  The detailed trip data Uber produced confirms

7    that—even assuming Plaintiff's flawed interpretation of the TSA constituted a breach— ████

8    ██████████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████.  Upfront pricing was

10   designed to make the cost of a trip clear and predictable for riders, based on factors including the

11   estimated time and distance at the start of a trip, without placing any of the risk associated with

12   those estimations on drivers, by continuing to remit their Fare for completing the trip based on the

13   actual work they do—*i.e.*, the actual distance traveled and time of the trip.  Sometimes Uber's

14   estimations were high, but they were just as often (if not more often) low relative to the actual

15   time and distance.  And the risk—and corresponding cost—of those under-estimations was borne

16   exclusively by Uber, to the drivers' benefit.  ████████████████████████████████

17   █████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████

19   █████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ███████████████████████████.  Thus, the allegedly "common" question of the

22   proper meaning of the TSA yields different outcomes for the proposed class members.

23          This variance between Plaintiff's view and the interests of most proposed class members

24   also renders Plaintiff an inadequate class representative.  ████████████████████████

25   █████████████████████████████████████████████████████

26   ██████████████████████████████████████████████████████

27   █████████████████████████████████████████████████████

28   █████████████████████████████████████████████

1 █████████████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████████████████

4 █████████████████████████████████████████████████ But even though the data

5 was readily available to him, Plaintiff does not even acknowledge the intra-class conflicts that

6 will obviously exist from different drivers having different net outcomes.  Instead, he merely

7 recites in his brief and again in his declaration the boilerplate assertion that he has "no conflicts of

8 interest with other class members."

9    Plaintiff's proposed class claim also is subject to certain defenses—*e.g.*, ratification and

10 estoppel—that apply to different putative class members in different ways.  A contract claim may

11 fail when a plaintiff continues to perform (or accept performance) in the face of an alleged

12 breach.  Yet Plaintiff did precisely that here—████████████████████████████████

13 █████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████. Some other class members

15 also may be subject to ratification and estoppel defenses because of their continued performance

16 even upon learning of Uber's interpretation of the TSA, whereas others that did not know (or

17 understand) the different payment methods—or that stopped driving after learning how their Fare

18 was determined—may not face the same obstacles.  These differences among class members, and

19 the particular facts subjecting Plaintiff to affirmative defenses not necessarily shared by all,

20 further defeat predominance and adequacy.

21    Plaintiff's certification motion ignores individualized issues and intra-class conflicts that

22 are obvious after even a cursory sampling of the trip data that Uber produced.  The Court should

23 therefore deny Plaintiff's motion for class certification.

24 **II.    FACTUAL BACKGROUND**

25    The crux of this case is the impact of Uber's decision to continue to interpret the TSA

26 related to driver payments consistently with prior practice (based on the actual time and distance

27 of the trips) even when Uber introduced its upfront pricing model for riders on certain Uber

28 products in 2016.  With upfront pricing, riders typically were quoted a price for a trip before they

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

1   selected the trip, which enabled better informed choices that fit their individual needs.  Upfront

2   pricing was designed to make Uber's pricing clearer and more predictable for riders, not to

3   undermine driver payments or earnings.

4         **A.      Uber Provides Lead Generation Technology Services**

5         Uber is a technology company that developed a software application that connects

6   individual riders seeking transportation with independent transportation providers (the drivers)

7   looking for paying passengers.  Trew Decl. ¶ 2.  Uber provides this technology through two

8   smartphone applications—the "Uber Rider App" and "Uber Driver App" (the "Uber Apps").  *Id.*

9   The Uber Apps enable authorized drivers like Plaintiff to "seek, receive, and fulfill"

10  transportation requests—sometimes called "Trips"—from riders.  *Id.*; Edwards Decl., Ex. A at 1.

11  A rider may request a Trip using the Uber Rider App for one of several Uber products, including

12  uberX and UberSELECT, each of which has different features and prices.  Trew Decl. ¶ 3.  For

13  example, uberX offers riders affordable and convenient peer-to-peer private transportation, while

14  UberSELECT is a premium version of uberX and thus is often a more costly option for riders.  *Id.*

15  Through the Uber Apps, riders are charged a price for a Trip, drivers are remitted a "Fare" for

16  completing that Trip, and Uber retains a "Service Fee" for the driver's use of the Uber Driver

17  App.  *Id.*  The rider's relationship with Uber is governed by rider-specific Terms of Service.  *Id.* ¶

18  4.  The driver Fare and Uber Service Fee, in contrast, are governed by a different contract—in

19  this case, the December 11, 2015 Technology Services Agreement ("TSA").  *Id.*; *see also*

20  Edwards Decl., Ex. A.

21        **B.      The Relevant Terms of the TSA**

22        The TSA governs the relationship between Plaintiff and other drivers and the relevant

23  Uber subsidiary.  The TSA sets forth, among other things, the steps a driver must take to opt out

24  of arbitration (as Plaintiff and the other putative class members purport to have done) and the

25  driver's payment terms.  Edwards Decl., Ex. A §§ 4, 15.3.  Under Section 4.1 of the TSA, for

26  each "completed" Trip a driver receives a "Fare" calculated "based upon a base fare amount plus

27  distance (as determined by [Uber] using location-based services …) and/or time amounts, as

28  detailed at www.uber.com/cities for the applicable territory ('*Fare Calculation*')."  *Id.*  The

driver's Fare "is the only payment [the driver] will receive" for a Trip.  *Id.*  Uber remits to the driver his or her Fare for completing the Trip, less any tolls, taxes, and other ancillary fees (paid by the rider), and the applicable Uber Service Fee, which under Section 4.4 of the TSA is "calculated as a percentage of the Fare determined by the Fare Calculation."  *Id.*  The Service Fee may vary depending on factors including the product used (*e.g.*, uberX, UberSELECT), the particular territory in which the Trip was completed, and the date of the Trip.  Trew Decl. ¶ 4; *see also* FAC, Ex. 2 (TSA Service Fee Addendum, Raleigh-Durham); Mot. at 3.  The TSA during the relevant class period stated that Uber expressly "reserve[d] the right to change the Service Fee at any time in [its] discretion," subject to notice to drivers.  Edwards Decl., Ex. A § 4.4.  And "[c]ontinued use of the Uber Services after any such change in the Service Fee calculation shall constitute [a driver's] consent to such change."  *Id.*

## C.   Uber's Implementation of Its Upfront Pricing Model for Riders

Beginning in 2016 for uberX and UberSELECT, Uber introduced in different U.S. cities and at different times its "upfront pricing" model, which was designed to make Uber's pricing clear and predictable for riders.  Trew Decl. ¶ 6.  Before upfront pricing, a rider typically was charged for a Trip according to a set base price plus a variable amount based on the actual distance traveled and time of the Trip.  *Id.* ¶ 5.  Riders also were responsible for any applicable fees, taxes and surcharges, and Uber's booking fee.  *Id.*; FAC, Ex. 2.  Information about the base price, booking fee, and per-mile and per-minute rates for a particular region were available to riders on Uber's website at www.uber.com/cities and within the Uber App for riders.  Trew Decl. ¶ 5; Edwards Decl., Ex. B (Pl.'s R&O to Uber's First Interrog. No. 16) ("Before upfront pricing, actual time and distance were used."); Mot. at 3 ("From the time Uber disseminated the TSA in December 2015 until it implemented upfront pricing, Uber performed one calculation based on actual inputs for time/distance at the end of each UberX and UberSelect ride ….").[1]

After the upfront pricing model was implemented, the rider's payment (including the time

---

[1] On page 3 of his Motion, Plaintiff purports to block-quote an excerpt from Uber's website as alleged in the FAC describing how rider charges were assessed before upfront pricing.  Mot. at 3 (citing FAC ¶ 19).  However, in his supposed quote, Plaintiff misleadingly capitalizes the "F" in "fare," apparently seeking to equate it to the driver "Fare" under the TSA.  No such capitalization appears on the website.

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

and distance variables) typically were estimated at the start of the Trip rather than based on the actual time and distance determined at the end of the Trip.  Trew Decl. ¶ 6.  Uber introduced upfront pricing to create more certainty for riders to enable better informed choices that fit their needs—not to undermine driver payments or earnings.  *Id*.  The TSA was unchanged from before the introduction of upfront pricing through the end of the proposed class period on May 22, 2017.  *Id.*; Maslo Decl., Ex. 3 (May 22, 2017 TSA Addendum).  Thus, after the introduction of upfront pricing to the riders, the driver's Fare under the TSA was calculated the same as it had been before Uber rolled out upfront pricing to riders.  Trew Decl. ¶ 6.

Plaintiff contends that the putative class members were significantly underpaid as a result of upfront pricing.  *E.g.*, Mot. at 4, 10; FAC ¶ 3.  Plaintiff's views of exactly how the contractual payment provisions of TSA should be interpreted have shifted.  In his FAC, discovery responses, and Motion, Plaintiff's view was that the TSA requires drivers to be paid "[w]hatever the passenger pays minus the service fee and booking fee …."  Edwards Decl., Ex. C (Pl.'s R&O to Uber's First RFPs No. 10); *id.*, Ex. B (Pl.'s R&O to Uber's First Interrog. No. 15) (same); FAC ¶ 47 ("The money passengers pay for a ride, minus Uber's service fee, belongs to Plaintiff and other drivers."); Mot. at 4 ("There is one core issue in this case: whether Uber's practice of paying class members based on a separate Fare from the one it collected from passengers breached the TSA."). ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████

In his Motion, Plaintiff repeats the assertion that Uber generally "over-estimated" the time and distance of a Trip for purposes of assessing a higher upfront price to a rider.  Yet Plaintiff offers no evidence to support that assertion, other than a single example of a trip (Mot. at 4)

1    where the driver was "underpaid" according to Plaintiff. █████████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████ █████████████████

5    ██████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████    In these

18   circumstances, and unlike under Plaintiff's theory, Uber (**not** the driver) bears the risk of the

19   under-estimation, to the driver's benefit—as both Plaintiff and this Court have recognized:

20       **THE COURT:** All right. So, yeah, I think [Plaintiff's] theory would be that if it
21       turned out in a given case to be worse off [due to Uber's under-estimation], the cab
         driver would have to take—the Uber driver would have to take less; right?

22       **MR. DRESSEL:** I mean, we would have to look at it, Your Honor, but that sounds
23       sensible to me.

         **THE COURT:** Listen—all right.  You're not going to get it both ways.
24
25       **MR. DRESSEL:** Understood, Your Honor.

26   *See* Edwards Decl., Ex. D at 3-4; *see also* McCrary Rpt. ¶¶ 26-27.

27   _____
     [2] Exhibit L to the Declaration of Randall W. Edwards is a report by Uber's expert, Professor
28   Justin McCrary.  It is cited throughout this opposition as "McCrary Rpt. ¶ __."

1    Thus, for each driver, the aggregate economic impact of Uber's interpretation of the TSA

2    on the driver's total rides may fluctuate—for example, a driver, in retrospect, could have been

3    overpaid relative to what Plaintiff contends the driver should have been paid after five rides, been

4    hypothetically underpaid after ten rides, and then again overpaid after twelve rides, and so on.

5    *See* McCrary Rpt. ¶ 45 ("It is also possible that some drivers might be better off for one period of

6    time under Mr. Dulberg's interpretation of the TSA and might be worse off for another period of

7    time.").  The only way to determine each driver's actual aggregate net economic position relative

8    to Plaintiff's preferred contract interpretation (even were the interpretation accepted) would be to

9    evaluate each Trip on a driver-by-driver basis.  McCrary Rpt. ¶ 40 ("This evidence suggests that

10   assessing whether any specific driver would be harmed based on an interpretation of the TSA

11   would require individualized analysis of the data on a ride by ride basis."). ██████████████

12   █████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████

16   ████████

17       **D.     Drivers' Knowledge and Understanding About Upfront Pricing Varied**

18       The evidence also varies regarding what drivers knew and understood about Uber's

19   upfront pricing and how it impacted their Fare under the TSA, as did drivers' conduct in response

20   to learning of such information. ████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ██████████████); Dulberg Decl. ¶ 2; Edwards Decl., Ex. B (Pl. Resp. to First Set Interrog. No.

24   19). █████████████████████████████████████████████████

25   █████████████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   ███████████████████████████████████████████████; and Plaintiff only

28   vaguely asserts in his declaration he "complain[ed] to Uber about this and g[ot] no satisfaction,"

*See* Dulberg Decl. ¶ 3;

Other drivers may have learned about upfront pricing at other times and in other ways— for example, from Uber's own website, which clearly stated, "Providing upfront fares to riders does not impact the driver fare, which remains calculated using the normal base/minimum fare plus time and/or distance scheme." Edwards Decl., Ex. E (UBER_LIT0013014, dated April 18, 2017). They also may have learned of it from communications or emails in which Uber responded to driver inquiries by explaining that their Fare "for this trip has been calculated accurately based on time taken and distance traveled." *Id.*, Ex. J (UBER_LIT0013042);

### E.   Plaintiff Improperly Extended Trips and Accepted Overpayments from Uber

On several occasions, Plaintiff "overcharged Uber" by extending Trips without basis or taking longer routes than necessary.

9

1

2

3

4

5

6

7

8

9

10

11       **F.**     <u>**The Scope of Plaintiff's Class Definition**</u>

12         In his complaint, Plaintiff defined his putative class as "All natural persons nationwide

13 who have worked or who continue to work as a driver for Uber during the time period it instituted

14 [its upfront pricing model] and who opted out of arbitration."  FAC ¶ 36.  In his Motion, however,

15 Plaintiff seeks to narrow his putative class to "All natural persons nationwide who (1) worked as

16 a driver for UberX or Uber Select; (2) opted out of arbitration; and (3) transported a passenger

17 who was charged an upfront price before they accepted Uber's updated fee addendum, which it

18 issued on May 22, 2017."  Mot. at 7.  Thus, Plaintiff's re-defined class is limited to individuals

19 who have driven with Uber using the uberX or UberSELECT products and who successfully

20 opted out of arbitration and completed at least one Trip for which a rider paid an upfront price.

21 The relevant class period is from December 11, 2015 (the date of the TSA) up to May 22, 2017

22 (the date of the TSA Addendum, which eliminated any possible claimed confusion over how the

23 driver's Fare under the TSA is determined).  *Cf.* Maslo Decl., Ex. 3.

24 **III.**     <u>**RIGOROUS ANALYSIS IS NEEDED TO CERTIFY A CLASS UNDER RULE 23**</u>

25         Class actions are "an exception to the usual rule that litigation is conducted by and on

26 behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).

27 As a procedural device, a class action cannot be used to deprive Uber of its substantive rights to

28 assert individualized defenses where a claim presents a factual and legal basis for a claimant-

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

1   specific defense.  *See* 28 U.S.C. § 2072; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613

2   (1997) (Rule 23 "shall not abridge, enlarge or modify any substantive right").  In his Motion,

3   Plaintiff misconstrues several aspects of the burden he must meet to warrant class certification

4   under Rule 23(b)(3), which is the only form of certification he seeks.

5           **A.**     **Plaintiff Must Provide Evidence to Support Each Element of Certification**

6         In his Motion, Plaintiff attempts to minimize his burden under Rule 23(b)(3), arguing that

7   the "allegations in [his] complaint [must be] accepted as true so long as those allegations are

8   sufficiently specific …."  Mot. at 7.  That is not the law.  *Wal-Mart Stores, Inc. v. Dukes*, 564

9   U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard.").  To the contrary,

10  the Court must "probe behind the pleadings" and conduct a "rigorous analysis" of the evidence of

11  both sides to determine whether Plaintiff "affirmatively demonstrate[d]" that each element of

12  Rule 23 is satisfied.  *Id.* at 350-51; *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir.

13  2012); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983-84 (9th Cir. 2011); *Fields v. Mobile*

14  *Messengers Am., Inc.*, 2013 WL 6073426, at *4 (N.D. Cal. Nov. 18, 2013) (Alsup, J.) ("Plaintiffs'

15  argument … does not satisfy their evidentiary burden under Rule 23(b) because it merely

16  speculates, without any actual evidence, that mass fraud may have occurred.").

17        The cases Plaintiff cites to the contrary have no application here.  The *Hofstetter* decision,

18  for example, pre-dates *Dukes* and cites to a statement from an earlier case (*Blackie v. Barrack*)

19  that likewise does not survive *Dukes*.  *Hofstetter v. Chase Home Fin., LLC*, 2011 WL 1225900, at

20  *6 (N.D. Cal. Mar. 21, 2011) (Alsup, J.) (cited in Mot. at 6-7).  And in her decision in *Cryer v.*

21  *Franklin Templeton Resources, Inc.*, Judge Wilken expressly stated that "[t]he court must conduct

22  a 'rigorous analysis,' which may require it to probe behind the pleadings before coming to rest on

23  the certification question" and "consider the persuasiveness of the evidence presented."  *Cryer*,

24  2017 WL 4023149, at *1 (N.D. Cal. July 26, 2017) (cited in Mot. at 7).

25        Uber does not contest the numerosity, commonality, or typicality requirements under Rule

26  23(a)(1)-(3) at this time.  But where, as here, Plaintiff fails to establish with "evidentiary proof"

27  that the other requirements of Rule 23 are met—in particular, predominance and adequacy—class

28  certification must be denied.  Fed. R. Civ. P. 23(a)(4), (b)(3); *Comcast Corp. v. Behrend*, 569

1    U.S. 27, 33 (2013).

2         **B.    Rule 23(b)(3) Predominance Requires Common Answers**

3         Although "[a]ny competently crafted class complaint literally raises common 'questions,'"

4    *Dukes*, 564 U.S. at 349, "[w]hat matters to class certification … is not the raising of common

5    'questions'—even in droves—but, rather the capacity of common answers apt to drive the

6    resolution of the litigation.'" *Id.* at 350.  Thus, even though Plaintiff's contract interpretation may

7    be a common issue under Rule 23(a)(2), Plaintiff must also satisfy the "far more demanding"

8    predominance requirement under Rule 23(b)(3) by establishing that common issues are "both

9    numerically and qualitatively substantial in relation to the issues peculiar to individual class

10   members." *Amchem*, 521 U.S. at 623-24; *Deitz v. Comcast Corp.*, 2007 WL 2015440, at *6

11   (N.D. Cal. July 11, 2007) (Alsup, J.) (the predominance inquiry "is far more demanding than the

12   Rule 23(a) commonality analysis" and "tests whether [the] proposed class … [is] sufficiently

13   cohesive to warrant adjudication by representation"); *In re Optical Disk Drive Antitrust Litig.*,

14   303 F.R.D. 311, 318 (N.D. Cal. 2014).  This inquiry "prevents the class from degenerating into a

15   series of individual trials." *Herskowitz v. Apple Inc.*, 301 F.R.D. 460, 470 (N.D. Cal. 2014) (the

16   "predominance inquiry is a pragmatic one … it is not bean counting").

17        **C.    Rule 23(a)(4) Adequacy of Representation Requires No Intra-Class Conflicts**
18        **and No Class-Representative Specific Defenses**

19        Plaintiff also must affirmatively establish that he is an adequate class representative.  Fed.

20   R. Civ. P. 23(a)(4).  As this Court has held, a class representative is inadequate if he has

21   "conflicts of interest with other class members" or "if there is a danger that absent class members

22   will suffer if [he] is preoccupied with defenses unique to him."  *See Backus v. ConAgra Foods,*

23   *Inc.*, 2016 WL 7406505, at *5-6 (N.D. Cal. Dec. 22, 2016); *Rodriguez v. W. Publ'g Corp.*, 563

24   F.3d 948, 959 (9th Cir. 2009) ("An absence of material conflicts of interest between the named

25   plaintiffs … with other class members is central to adequacy[.]"); *Hanlon v. Chrysler Corp.*, 150

26   F.3d 1011, 1020 (9th Cir. 1998) (named plaintiffs must not "have any conflicts of interest with

27   other class members"); *Ellis*, 657 F.3d at 985 (similar).  Merely incanting that Plaintiff "has no

28   conflicts of interest" (*e.g.*, Mot. at 1, 6) is not sufficient—███████████████████████

12

1

2

3                                                                    ; *see also*

4  Dulberg Decl. ¶ 6.

5  **IV.    INDIVIDUALIZED ISSUES DEFEAT PREDOMINANCE AND ADEQUACY**

6        **A.    The Essential Element of Fact of Damage Requires Individualized Evidence
           and Creates a Serious Conflict of Interest**

7

8            To state a claim for breach of contract, Plaintiff must establish not only a contract breach,

9  but also resulting damage.  *E.g.*, *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908-09 (N.D. Cal.

10  2011) (Alsup, J.) (citing *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (Cal. 2011)).  In

11  his Motion, Plaintiff focuses almost exclusively on "breach," asserting Rule 23's predominance

12  and adequacy requirements are "easily" satisfied because the "only substantive issue" and

13  "singular focus" in the case will be "whether Uber breached the TSA when, after implementing

14  upfront pricing, it paid drivers based on a different fare than the one it collected from

15  passengers."  Mot. at 1; *see also id.* at 9 ("[T]he entire case hinges on the interpretation of the

16  TSA.").  But while breach is *one* important issue, that issue is insufficient for certification in *this*

17  case given the individualized nature of other fundamental issues and given the conflicts that

18  pervade Plaintiff's class claims.  In particular, the substantial variance among the majority of

19  putative class members who *benefited* from Uber's interpretation of the TSA relative to the

20  minority who may have preferred Plaintiff's interpretation means that the contract interpretation

21  question will not "drive the resolution of the litigation."  Certifying a class here also would pit

22  Plaintiff's interests against the interests of many of the drivers he purports to represent.

23            1.    **The Element of Fact of Damage Requires Individualized Evidence**

24            Plaintiff cannot establish the basic element of *fact* of damage—distinct from the

25  calculated *amount* of damages—on a class-wide basis with common evidence.  *See Lucas v.*

26  *Breg, Inc.*, 212 F. Supp. 3d 950, 970 (S.D. Cal. 2016) ("While determining the *amount* of

27  damages" may not "defeat the predominance inquiry, a proposed class action requiring the court

28  to determine individualized *fact* of damages does not meet the predominance standards of Rule

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

23(b)(3).”); *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *19 (E.D. Cal. Jan. 3, 2012) (no

predominance where “[t]he evidence indicates a myriad of individual inquiries are required to

ascertain the fact of damages for each Class member”).  Courts “must give full consideration” to

whether Plaintiff’s damages evidence “is sufficient to establish class-wide proof of actual injury

and/or damages for each absent class member.  Otherwise, Rule 23 would be used to truncate the

required substantive elements of proof by each claimant in violation of the Rules Enabling Act.”

*Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810, at *14 (N.D. Cal. Mar. 26, 2010) (Alsup, J.).

      In his Motion, Plaintiff glosses over the fact-of-damage issue by arguing that common

questions must predominate because his claim involves a breach of a “form contract,” which

courts “routinely certify”; he assumes (without showing any evidence) that all drivers in the

putative class “suffered the same alleged breach of contract injury.”  Mot. at 10-12.  To the

contrary, whether a particular driver was injured at all depends on evidence that varies among the

thousands of drivers in the putative class.  Uber’s estimates for purposes of calculating the rider’s

upfront price fluctuated relative to actual Trip time and distance—sometimes they were high

relative to actual time and distance, sometimes low, and sometimes they matched.  Trew Decl. ¶

7; McCrary Rpt. ¶¶ 28-46, Ex. 3. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ To assess

whether any specific driver was damaged at all requires an individualized analysis of the data on

a per-Trip and per-driver basis to evaluate how much the driver was paid versus how much

Plaintiff contends the driver should have been paid, ████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. Plaintiff acknowledges as

much by stating that “calculating damages merely involves subtracting what the class members

were paid from what they should have been paid” using Uber’s “ride-by-ride data for every

member of the class over the relevant time period.”  Mot. at 13. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19   The only way to determine which class members were better off under Plaintiff's theory—and

20   thus even ***conceivably*** entitled to damages—is to analyze the financial impact for each Trip and

21   for each driver, and then to aggregate that information on a driver-by-driver basis.  *Id.* ¶ 40.

22          In addition, even for drivers for whom the raw data might suggest had an aggregate net

23   hypothetical underpayment, individualized questions exist about whether they can establish the

24   required element that they were actually injured.  The reason for this uncertainty is that evaluating

25   injury depends not just on simply a comparison of actual and hypothetical Fares, but also

26   consideration of the value each driver places on ***price certainty*** and ***risk avoidance***.  It is a basic

27   tenet of economics that in general people place a positive value on those factors.  McCrary Rpt.

28   ¶¶ 26-27.  As Professor McCrary explained, "Economic agents dislike risk generally, and at least

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

1  some drivers presumptively would have preferred to avoid bearing any risk associated with

2  Uber's upfront pricing[.]"  *Id.*  This means that a driver may conclude he or she is better off with

3  the price certainty and risk avoidance of actual time-and-distance based payments rather than

4  payments based on upfront pricing estimates, even if those estimates may in hindsight have been

5  slightly higher for that particular driver.  This is no mere hypothetical issue.  Under the current

6  application of the TSA, drivers receive payments for the work they do—*i.e.*, for the actual time

7  and distance traveled on each Trip, regardless of any externalities.  Uber assumes the variance

8  and risk of its upfront pricing estimates—and absorbs the cost every time it underestimates the

9  time and distance of a Trip for purposes of calculating the rider's upfront price▐▐▐▐▐▐▐▐▐

10  ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

11  ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

12  ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

13  ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

14  In contrast, Plaintiff's theory would shift that risk entirely to drivers—drivers would earn based

15  on the upfront price paid by the rider; thus, drivers would earn less than they currently do every

16  time Uber underestimates the rider's upfront price or the rider applies a promotion that reduces

17  his or her charge.  *Id.*; Edwards Decl., Ex. D (Hr'g Tr. at 3-4); *id.*, Ex. B (Pl.'s R&O to Uber's

18  First Interrog. No. 15 ("Whatever the passenger pays minus the service fee and booking fee

19  should be passed along to the driver.").  The degree to which drivers in the putative class value

20  certainty in how they are paid requires further individualized inquiry bearing directly on the fact-

21  of-damage element of the claim.

22       The few cases Plaintiff cites in his Motion to argue that his class claim is the type that

23  courts "routinely certify" establish no such thing given the factual differences in this case.  Those

24  cases did not involve anything like the highly individualized fact of damage issues that raise

25  fundamental problems weighing against certification here.  Mot. at 10-12, citing *Chastain v.*

26  *Union Sec. Life Ins. Co.*, 2008 WL 11333691, at *4 & n.4 (C.D. Cal. May 6, 2008) (certifying

27  class in part because "the fact of injury is common"); *Rodman v. Safeway, Inc.*, 2014 WL 988992,

28  at *9 (N.D. Cal. Mar. 10, 2014) ("If Plaintiff can prevail on the merits on its theory of the

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

contract, all Class Members will have damages in the amount of the undisclosed fees, and calculating damages is a simple matter of refunding those charges."); *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *20-21 (N.D. Cal. June 13, 2014) (finding predominance of common questions because, among other things, the proposed contract claim class ***excluded*** those states "where damages are an element of breach"); *In re Med. Capital Sec. Litig.*, 2011 WL 5067208, at *2-9 (C.D. Cal. July 26, 2011) (certifying claims where there was no individualized issue regarding fact of damage for threshold liability); *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *6-11 (N.D. Cal. Oct. 25, 2010) (certifying class where reliance, consumer status, ***and*** fact of damages could be resolved on a classwide basis); *Vedachalam v. Tata Consulting Servs.*, 2012 WL 1110004, at *13, 18 (N.D. Cal. Apr. 2, 2012) (finding predominance satisfied where arguments on damages related to amount of damages; opinion does not identify defendant having presented any fact-of-damages arguments that different class members have different net monetary outcomes under Plaintiff's proposed contract interpretation).  To be sure, some cases involving "form contracts" have been found to warrant class treatment.  But Plaintiff's class claim in this case presents unique and complex issues related to fundamental elements of contract liability (fact of damage, among other things) that go far beyond anything involved in the "form contract" cases that Plaintiff cites.

### 2.    **Plaintiff Ignores Serious Intra-Class Conflicts**

The different outcomes for different class members under Plaintiff's theory also creates an inherent intra-class conflict and renders him an inadequate class representative.  *E.g.*, *Amchem*, 521 U.S. at 625-26 ("[A] class representative must … possess the same interest and suffer the same injury as the class members.").  Even if Plaintiff himself would have been slightly better off under his theory of the TSA, the same cannot be said for the majority of the proposed class.

17

1

2

3   ████████████████████████████████████████ These thousands of

4   proposed class members have no interest in pursuing a breach of contract claim against Uber or

5   asking that the Court issue a binding order and judgment that in essence declares they were

6   **overpaid**.  Yet that is precisely what Plaintiff seeks—a classwide ruling from the Court regarding

7   the interpretation of the TSA that would apply to all drivers and that would be directly contrary to

8   the interests of well over half the drivers Plaintiff purports to represent.  This is a fundamental

9   conflict and confirms that Plaintiff hardly "possess[es] the same interest and suffer[ed] the same

10   injury" as many class members he seeks to represent.  *Amchem*, 521 U.S. at 625-26; *see also, e.g.*,

11   *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 177 (C.D. Cal.

12   2007) (denying class certification on adequacy grounds, explaining "no circuit approves of class

13   certification where some class members derive a net economic benefit from the very same

14   conduct alleged to be wrongful by the named representative of the class …").

15        This intra-class conflict is irreconcilable.  It cannot be remedied by seeking to redefine the

16   class to represent only the minority of drivers who—in retrospect—would have been

17   economically better off under Plaintiff's preferred interpretation of the TSA.  To do so would

18   constitute an impermissible fail-safe class defined by the very individualized liability

19   determination itself.  *E.g.*, *Velasquez v. HSBC Fin. Corp.*, 2009 WL 112919, at *4 (N.D. Cal.

20   Jan. 16, 2009) ("Fail-safe classes are defined by the merits of their legal claims, and are therefore

21   unascertainable prior to a finding of liability in the plaintiffs' favor."); *Ubaldi v. SLM Corp.*, 2014

22   WL 1266783, at *6 (N.D. Cal. Mar. 24, 2014) (a fail-safe class is "'palpably unfair to the

23   defendant'" and "unmanageable because it is unclear in such cases to whom class notice should

24   be sent") (quoting *Kamar v. Radio Shack*, 375 F. App'x 734, 736 (9th Cir. 2010)); *Torres v.

25   Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016) ("[D]efining the class to include

26   only those individuals who were 'injured' … threatens to create a 'fail safe' class, one that is

27   defined so narrowly as to 'preclude[] membership unless the liability of the defendant is

28   established.'"); *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (fail-

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

1   safe class "shields the putative class members from receiving an adverse judgment.  Either the

2   class members win or, by virtue of losing, they are not in the class and, therefore, not bound by

3   the judgment.").  Moreover, even drivers (like Plaintiff) that the Trip data might suggest on its

4   face were underpaid under Plaintiff's theory may not have any cognizable injury depending on

5   their individual risk tolerance.  *See supra* Section IV.A.1; McCrary Rpt. ¶¶ 26-27.  If a single

6   class were to be certified based on a uniform interpretation of the TSA, then the thousands of

7   class members who would be better off under Uber's current interpretation (compared to

8   Plaintiff's) should be represented by a driver who, unlike Plaintiff, shares their interests and seeks

9   to support Uber's interpretation.  This inherent clash of interests obviously makes no practical

10  sense, which is precisely why a class should not be certified in this case.  *E.g.*, *Allied Orthopedic*,

11  247 F.R.D. at 177.

12            **B.**      **<u>Uber Has Plaintiff-Specific and Individualized Defenses That Further</u>**

13                    **<u>Preclude Certification on Predominance and Adequacy Grounds</u>**

14         In addition, whether analyzed as a predominance issue under Rule 23(b)(3) or as an

15  adequacy issue under Rule 23(a)(4), Uber has the right to present individualized defenses that

16  would preclude recovery for Plaintiff and certain other class members.  *See* 28 U.S.C. § 2072;

17  *Amchem*, 521 U.S. at 613 (Rule 23 "shall not abridge, enlarge or modify any substantive right");

18  *Monaco v. Bear Stearns Cos.*, 2012 WL 10006987, at *9 (C.D. Cal. Dec. 10, 2012) ("[T]he

19  existence of … [affirmative] defenses, and the fact that their application will likely involve

20  individualized determinations, weighs against the certification of the proposed Subclass.");

21  *Aghdasi v. Mercury Ins. Grp., Inc.*, 2016 WL 5899301, at *2 (C.D. Cal. Jan. 12, 2016) ("As

22  adjudication of the merits of these individualized arguments concerning consent would inevitably

23  lead to individualized evidentiary hearings, the benefits to be derived from class certification …

24  are lost."); *Curtis v. Extra Space Storage, Inc.*, 2013 WL 6073448, at *2-4 (N.D. Cal. Nov. 18,

25  2013) (Alsup, J.) ("Defendants must be given the opportunity to argue abandonment on a case-

26  by-case basis.  Accordingly, individual issues predominate and class certification is denied.").

27  Moreover, as this Court has explained in addressing the adequacy requirement in another case,

28  "class certification should not be granted if there is a danger that absent class members will suffer

UBER'S CLASS CERT. OPP.
17-CV-00850-WHA

1    if [Dulberg] is preoccupied with defenses unique to [him]." *Backus*, 2016 WL 7406505, at *5.

2         Uber is entitled to assert certain affirmative defenses that may doom Plaintiff's claim and

3    that also apply to different putative class members differently depending on each driver's unique

4    circumstances.  Under California law, a plaintiff's contract claim may be barred "where [he] has

5    knowledge of the defendant's breach and continues to perform under the contract and/or accepts

6    the defendant's performance without notifying the defendant of the breach[.]" *Roling v. E*Trade*

7    *Sec. LLC*, 860 F. Supp. 2d 1035, 1039-40 (N.D. Cal. 2012); *see also Robinson v. Onstar, LLC*,

8    2016 WL 4493733, at *5 (S.D. Cal. Aug. 25, 2016); Cal. Evid. Code § 623 (codifying estoppel

9    defense); *Lassen Mun. Util. Dist. v. Kinross Gold U.S.A. Inc.*, 2013 WL 924623, at *10 (E.D. Cal.

10   Mar. 8, 2013) ("Ratification may be implied from any acts or conduct showing an intention to

11   affirm the contract, which may include an acceptance of the benefits or burdens of the contract.").

12   Individual evidence exists for Uber to present such a defense against Plaintiff. ███████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ████████ *see also id*., Ex. B (Pl.'s R&O to Uber's First Interrog. No. 19).  ████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   Were these claims to proceed individually, Uber would be able to develop evidence that other

19   drivers in the putative class likely had similar information (after all, the impact of upfront pricing

20   was announced on Uber's website and in emails sent to drivers, █████████████████████

21   █████████████████████████████████████) subjecting them to the same

22   defenses that apply to Plaintiff.  *See supra* § II.D.

23        Of course, that type of evidence—what a driver saw and knew and when, and whether the

24   driver continued to drive—will vary from driver to driver.  Those drivers who were not aware (or

25   did not understand) that their Fare was based "on something other than the upfront [price] paid by

26   the passengers"—or stopped driving after learning of such facts—may not face the same

27   affirmative defenses.  But other, more knowledgeable drivers may be.  Likewise, drivers who in

28   the initial part of the class period benefited from Uber's interpretation of the TSA and continued

UBER'S CLASS CERT OPP.
17-CV-00850-WHA

1   to drive may be barred from asserting a breach of contract claim, even if, in retrospect, they later

2   would have benefited from Plaintiff's preferred interpretation.  *E.g.*, Cal. Civ. Code § 1589

3   ("voluntary acceptance of the benefit of a transaction is equivalent to a consent to all obligations

4   arising from it ...."); *Moore v. Southtrust Corp.*, 2005 WL 4663636, at *15 (E.D. Va. June 10,

5   2005) (granting summary judgment on contract claim because plaintiff received the benefit of

6   purchases he claimed were unauthorized); *Levy v. World Wrestling Entm't, Inc.*, 2009 WL

7   455258, at *2 (D. Conn. Feb. 23, 2009); *see also* McCrary Rpt. ¶ 45 ("It is also possible that

8   some drivers might be better off for one period of time under Mr. Dulberg's interpretation of the

9   TSA and might be worse off for another period of time.").  These differences in the applicability

10   of certain affirmative defenses further defeat predominance and adequacy. *E.g.*, *Amchem*, 521

11   U.S. at 613.

12   **V.**    **CONCLUSION**

13         Plaintiff's motion is based on assumptions about the impact of upfront pricing that are

14   demonstrably incorrect.  Whether a particular driver would have benefited depends on his or her

15   unique driving history, as do Uber's affirmative defenses, and Plaintiff's proposed class claim (if

16   certified and Plaintiff succeeds on the merits) would result in a judgment that, as a practical

17   matter, would be "against" thousands of the drivers that Plaintiff claims he should be allowed to

18   represent.  Plaintiff's Motion for Class Certification, ECF No. 67, should be denied on both

19   predominance and adequacy grounds.

20

21        Dated:  January 11, 2018            O'MELVENY & MYERS LLP

22                                  By:  /s/ Randall W. Edwards

23                                    Randall W. Edwards
                                     Attorneys for Defendants

24                                     Uber Technologies, Inc. and Rasier, LLC

25

26

27

28